IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAKE J. SIZEMORE,

                               Plaintiff,

      v.

SCOTT M. RUBIN
and MARIA LEMIEUX,

                             Defendants.

OPINION AND ORDER

20-cv-251-wmc

This case arises out of the challenges of addressing the mental health needs of incarcerated individuals who engage in self-harm. Plaintiff Jake J. Sizemore, appearing by counsel, contends that the two named defendants, psychologists employed by the Wisconsin Department of Corrections ("DOC"), both failed to prevent him from harming himself and denied him adequate mental health treatment in violation of his Eighth Amendment rights while he was incarcerated at the Wisconsin Secure Program Facility ("WSPF"). Defendants seek summary judgment on all of Sizemore's claims against them, arguing that the undisputed evidence of record requires a finding that they were not deliberately indifferent to his mental health needs or risk of self-harm. (Dkt. #27.) For the following reasons, the court agrees.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff Sizemore, currently an inmate at Fox Lake Correctional Institution, has an

---

[1] The following facts are drawn from the parties' proposed findings of facts and responses in a light most favorable to plaintiff as the non-moving party, and are undisputed except where noted.

extensive history of mental health and behavioral issues dating back to childhood.  From November 2016 through January 2021, Sizemore was housed at WSPF, a maximum-security prison, before transferring to Jackson Correctional Institution ("JCI") and then to the Wisconsin Resource Center ("WRC").  Sizemore arrived at WSPF with a diagnosis of a generalized anxiety disorder, as well as inhalant, cannabis and alcohol use disorders. (Dkt. #30-1 at 131.)  While at WSPF, he was further diagnosed with an antisocial personality disorder.

Defendant Scott Rubin-Asch has a doctorate in counseling psychology.  As the Psychologist Supervisor at WSPF from April 2017 until August 2020, he was responsible for the supervision of clinicians in the Psychological Services Unit ("PSU").  Rubin-Asch also provided input and feedback regarding the psychological assessment of inmates, as well as responded to inmate psychological service requests ("PSR") when more appropriately coming from him than from the inmate's assigned clinician or other PSU staff member.  In particular, Rubin-Asch responded to several of Sizemore's PSRs directed to him, and occasionally he also met with Sizemore to discuss mental health concerns.

Defendant Maria Lemieux is a licensed professional counselor with a master's degree in educational psychology.  As a Psychological Associate, she conducts mental health screenings and mental health monitoring, and she provides crisis intervention and prevention, individual counseling and psychotherapy, and psychological assessments.  She may also request or refer an inmate for medications from a psychiatrist, but she cannot prescribe medications.  Lemieux was Sizemore's assigned clinician upon his intake and throughout much of his stay at WSPF.

### B. Mental Health Treatment at WSPF

When any inmate arrives at WSPF, a PSU clinician will conduct an initial screening and classify his mental health needs. The PSU's primary mission is to identify and treat inmates with mental health problems effectively through screening upon arrival, developing proper, individualized courses of mental health treatment, and conducting follow up evaluations and counseling sessions as necessary.

Among other steps, PSU clinical staff may place inmates at risk of hurting themselves or others on clinical observation status. This non-punitive status is used to confine temporarily an inmate to ensure his safety and the safety of others, but only when there is evidence that the inmate poses an immediate danger to his safety and well-being. PSU staff must check on an inmate placed in clinical observation as soon as possible, as well as conduct subsequent evaluations at least once a day. Prison staff must also monitor the activities of inmates on clinical observation by conducting cell front checks every fifteen minutes. Further, those inmates who are at high risk for imminent suicidal behavior are on constant observation, meaning that staff maintain continuous line-of-sight monitoring.

Although disfavored generally, clinical staff may even authorize the use of mechanical restraints to confine an inmate in clinical observation as a last resort, when necessary to evaluate their needs and prevent harmful behaviors. However, PSU staff must follow specific procedures when placing an inmate in restraints, and only qualified, PSU clinical staff may determine that an inmate requires mechanical restraints for clinical purposes. PSU staff must also conduct an assessment immediately following any placement in restraints, with subsequent assessments at least every two hours that the inmate is in restraints. Similarly, a PSU clinician decides whether an inmate may be

released from clinical observation or mechanical restraint placement. Because the goal on observation or with restraints is to address the inmate's acute mental health needs and safety, regular therapy sessions are not conducted while an inmate is in either kind of placement.

For inmates that may benefit from specialized, intensive mental health treatment, PSU Psychologist Supervisor Rubin-Asch could recommend referral to WRC, provided that inmate's treatment team concludes a referral would be potentially beneficial. Rubin-Asch attests that a referral of an inmate to the WRC is generally warranted if he would benefit from programming opportunities there that are well suited to his clinical needs *and* he is likely to successfully complete the program. However, *WRC* staff make the final decision to approve or decline an inmate's placement there based on the inmate's need, willingness and motivation for treatment, as well as the clinical appropriateness for a WRC treatment program and the availability of bed space in that program.

### C. Sizemore's Mental Health Treatment at WSPF

### 1. Mental Health Intake at WSPF

Sizemore was transferred to WSPF in early November 2016, and he underwent a mental health intake screening. The examining psychologist noted at intake that Sizemore had been diagnosed with generalized anxiety disorder, but he denied any current suicidal ideation. Sizemore was then given a mental health code of MH-1 -- meaning that he had some documented mental health needs but was not considered seriously mentally ill. Inmates with an MH-1 mental health code have clinical visits at a minimum of once every six months. While Sizemore disputes that this classification was an accurate indication of

4

his mental health needs in light of his extensive history of mental health issues and trauma stemming from his childhood, that dispute is not material since neither defendant was involved nor does Sizemore offer any expert witness or similar, contemporaneous medical diagnosis from which a jury could conclude that he should have been classified differently.

Rather, on January 23, 2017, defendant Lemieux saw Sizemore for the first time, who reported having issues with previous medications, being depressed, and experiencing recent suicidal ideations, although he denied current thoughts of self-harm.  Lemieux further observed that Sizemore had not yet visited with a psychiatrist, and she referred him to the health services unit ("HSU") to address any medication needs.

### 2.  Clinical Observations in 2017

About five months after his initial intake, May 26, 2017, someone on the PSU staff placed Sizemore on clinical observation after he reported ingesting a large amount of medication and stated that he had been "struggling lately" and was "having a difficult time dealing with his feeling/thoughts."  (Dkt. #30-1 at 238.)  Sizemore was then taken to the hospital for evaluation and treatment and further evaluated at his cell front when he returned.  Specifically, Sizemore told a nondefendant clinician that he had taken "sixty naproxen" and was "upset with staff and HSU discontinued the wrong medication."  (*Id.* at 236.)  Following his May observation placement, Sizemore's prescription medications were restricted to dispensing only by staff, nor was he allowed to have medications from canteen in his cell.  This restriction remained in place for most of the remainder of his time at WSPF.

Thus, Lemieux attests, she believed his risk of self-harm had been reduced, although Sizemore alleges that he was often able to "cheek" his medication and hoard it due to WSPF staff occasional failure to confirm that he had swallowed the pills provided. (Dkt. #57 at ¶ 62.) Lemieux saw Sizemore for a follow-up appointment again on June 6, 2017, a week after his observation placement ended. Sizemore reported "passive, fleeting thoughts of self-harm but denied any plan or intent to harm himself." (Dkt. #30-1 at 124.) Lemieux reminded Sizemore that he could write to PSU with any mental health concerns.

However, a few days later, on June 13, Lemieux placed Sizemore back on observation status after he made a "vague statement" alluding to self-harm, and skipped his morning medication, appeared "agitated," and wanted "PSU to fix the situation with his radio." (*Id.* at 234.) At his one-day, follow-up appointment with Lemieux, however, Sizemore not only reported no thoughts of self-harm but asked about coping skills and in-cell anger management programming. Sizemore also reported no concerns or suicidal ideation at his seven-day follow up appointment with Lemieux, and she promised to send Sizemore information packets about coping skills and anger management strategies.

On December 6, 2017, a different clinician again placed Sizemore on clinical observation status after he reported overdosing on medication and being taken to the hospital. When the clinician later tried to evaluate Sizemore at his cell front, he "was very agitated [and] argumentative." (*Id.* at 230.) When his mood improved the next day, however, he was released from observation. Further, when Lemieux followed up with Sizemore on December 8, he informed her that he had been sexually abused as a child.

Sizemore also denied any suicidal ideation at that time, asked for more in-cell programming, and asked to meet with an inmate mentor.

Just eleven days later, on December 19, Lemieux had placed Sizemore back on observation status after he again reported overdosing and receiving hospital treatment. Because Sizemore "became non-compliant during the escort back to the observation cell" and said he would try to hurt himself, as well as staff, Lemieux further placed him in mechanical restraints.  (*Id.* at 228.)  He was released from restraints later that day after appearing calm to Lemieux and asking her for an appointment with PSU.  With regards to this incident, Sizemore later told another clinician that he had yet again been checking his medication, "was trying to prove a point," and "wanted different meds."  (*Id.* at 225, 226.)

On December 25, Sizemore next reported taking pills and ingesting shampoo, prompting a clinician to return him to observation status.  As to this report, Sizemore admitted that he had been upset by his unit not going to recreation, noted that he was working with Lemieux on improving his coping skills, and denied thoughts of self-harm. At one-week follow-up appointment with Lemieux, Sizemore once again denied any suicidal ideation that day.  Although Psychological Associate Lemieux did not change his mental health classification after one year of treatment, she nevertheless added a diagnosis of antisocial personality disorder based on his now demonstratable pattern of manipulative behavior, including five clinical observation placements, and one placement in restraints. Treatment for antisocial personality disorder includes talk therapy, which Lemieux was qualified to provide Sizemore at WSPF.

### 3.  Clinical Observation and Treatment from January through May of 2018

On January 2, 2018, Lemieux placed Sizemore back on observation status after he put staples in his arm.  She then placed him back in restraints after he began banging his head in his observation cell.  Sizemore also told Lemieux that he had been having issues with his medication, felt that he was not "getting the help he needs and is not being heard," and "wanted to be placed in restraints."  (*Id.* at 217.)  Lemieux followed up with Sizemore one day after his release from observation, at which point he reported feeling safe in restraints.  He also said that he was keeping busy, was journaling and enjoyed writing to his girlfriend.  Sizemore further explained that he self-harmed for various reasons, including his having issues with his medication, belief that he should not be at WSPF, suicidal thoughts, and asking about psychological testing.  However, Lemieux told Sizemore that psychological testing had to be completed *before* the WRC would consider accepting him.  She also discussed coping skills with him.

As of 2018, Lemieux attests that she did not support referring Sizemore to the WRC because he was already receiving appropriate treatment at WSPF and had the necessary resources to improve.  Moreover, Lemieux noted Sizemore's recent, behavioral issues and lack of motivation to improve, as well as the possibility that he just wanted to engage in testing.  In contrast, Sizemore attests that he actually wanted testing to be diagnosed properly and ensure that he was on the correct medication; he also submitted PSRs to help cope with past trauma, but notes both defendants Lemieux and Rubin routinely ignored evidence of his self-harm and his pleas for help.

After showing another clinician a staple in his arm and threatening continued self-harm, Sizemore was once more returned to observation on January 6.  Security staff also

put Sizemore in restraints after he told a captain that he would cut himself if not strapped down. Sizemore was removed from the restraints the next day, but returned to restraints after he began to bang his head on the wall and told staff that he would continue to do so unless they strapped him down again. When Lemieux attempted to speak with Sizemore about these incidents the next day, he further refused to respond, prompting her to keep him on observation status. However, at Lemieux's one-week follow up, Sizemore denied any thoughts of self-harm, asked about his working on the in-cell coping skills packet, and admitted failing to utilize skills and techniques he had previously discussed with Lemieux.

Just 17 days later, on January 23, however, Lemieux put Sizemore back on observation status after he reported ingesting pills. In response, Sizemore also threatened more self-harm and Lemieux again authorized the use of restraints. Then, Sizemore again told Lemieux that he liked being in restraints and asked if he could be placed in restraints any time he wanted. Instead, Lemieux discussed more appropriate coping skills with Sizemore. Another clinician returned Sizemore to restraints on January 25, 26, and 28, because he was banging his head on the wall of his observation cell and had tied a washcloth around his neck. At a January 29 visit with Lemieux, Sizemore also became argumentative, claimed he continued "to ask for help but doesn't get it," and requested psychological testing. (*Id.* at 187.) In particular, Sizemore indicated that being in observation, in restraints, doing the packets, and taking his medication was not helping him. Lemieux met with Sizemore again on January 30 and 31, but while he initially reported feeling suicidal, his mood improved, and he was released from observation after denying any suicidal ideations on January 31.

A day later, Sizemore met with Lemieux once again.  Among other things, they discussed the possibility of proceeding with psychological testing *provided* he demonstrated a period of stability.  Sizemore also denied feelings of anxiety or suicidal ideation; he also received a new coping skills packet.  Lemieux attests that Sizemore needed a period of stability before psychological testing because a period of stability would allow the staff's focus to shift from triaging his threats of regular self-harm to getting him tested.  Sizemore disputes this assertion, contending that Lemieux was at best inconsistent in her requirements for testing.[2]  Moreover, Sizemore also filed an inmate complaint on January 22, asserting that WSPF lacked adequate mental health treatment for his conditions.  Before filing this complaint, he also spoke to defendants Rubin-Asch and Lemieux about this issue, without result.  Specifically, Sizemore complained that PSU had not conducted any psychological evaluation to identify his mental health issues and appropriate treatment.  However, that complaint was dismissed.

Sizemore was next placed in observation on February 2, 2018, after reporting thoughts of self-harm to security staff.  Lemieux met with him the following day, and kept him in observation after he refused to get up to be assessed or respond to her attempts to speak with him.  Sizemore was further placed in restraints on February 4 after he began banging his head and threatening to continue to do so until fully restrained.  At a follow-up appointment on February 6, Sizemore said that he was not ready to leave observation.

---

[2] In support, Sizemore notes that several months later, on June 29, 2018, he met with Psychologist Supervisor Rubin-Asch *and* Psychological Associate Lemieux, both of whom explained that a psychological assessment could be performed to "help with further diagnostic clarification" even though he had exhibited self-harming behavior that same month.  (*Id.* at 95.)

Although he also discussed obtaining his GED and a job, Sizemore still reported feeling depressed and experiencing thoughts of self-harm.

On February 8, Sizemore submitted a PSR stating that family deaths were contributing to his suicidal thoughts, self-harming, depression, anger, and night terrors. Sizemore further explained that he wanted help, but so far would "only get placed in observation/strapdown." (Dkt. #42 at 31.) In response, Rubin-Asch encouraged him to work with Lemieux. Sizemore submitted another PSR on February 11 asking to "get tested to properly be di[a]gnosed." (*Id.* at 32.) Lemieux responded that Sizemore was scheduled to be seen again on February 13.

At this February 13 appointment, Sizemore told Lemieux that he was having regular suicidal thoughts and asked about a psychological assessment. When Lemieux again explained that he would not be referred to the WRC while such testing took place, Sizemore became agitated but was calm when he left the appointment. At that time, Lemieux also noted Sizemore's recent observation and restraint placements, remarking that these placements appeared to have been "primarily instrumental in nature." (*Id.* at 113.) In particular, she concluded that Sizemore was inconsistently using coping skills and engaging in self-harming threats and behaviors to try to get transferred to the WRC, which was closer to his girlfriend. Although Sizemore and his girlfriend now dispute these conclusions, Psychological Supervisor Rubin-Asch agreed with Lemieux's assessment.

Sizemore was returned to observation on February 19 after reporting to security that he felt suicidal. After being placed in restraints because he began banging his head against a wall and threatening to hang himself with a shoelace, Sizemore met with Lemieux the next day, February 20, who removed him from observation status, noting that he was

11

"having a good day and doing well" and "denied any thoughts of self-harm." (*Id.* at 175.) Later that day, however, Sizemore stated that he wanted to go back to observation and that he may self-harm, prompting Lemieux to return him to observation status for two more days.

On February 26, Lemieux placed Sizemore back on observation status after he tore up a towel and made a noose around his neck.  Sizemore had also reported taking several pills, although subsequent testing at the hospital was negative for any signs of a medication overdose.  Sizemore also requested psychological testing once again, while Lemieux again responded that he would need to demonstrate stability first, outside of clinical observation, something he had been able to do at least once in the past.  While in the observation cell, Sizemore banged his head on the window, so Lemieux also authorized restraints.  She determined that Sizemore needed to remain in restraints the following day because he was still agitated, while he told Lemieux to "try harder" to help him.  (*Id.* at 167.)  Another clinician released Sizemore from restraints on February 28 after he denied thoughts of self-harm and had maintained stable behavior.

Lemieux met with Sizemore again on March 19, 2018, after he told unit staff that he had strong urges to cut himself and bang his head.  Sizemore indicated that he was doing better and taking his medications, but requested that he be given a different mental health classification in light of his antisocial personality disorder diagnosis.  However, Lemieux attests his classification was not changed at that time because Sizemore was not considered to have a serious mental illness, despite several instances of threatening and even engaging in self-harm.

Sizemore next met with both Lemieux and her supervisor Rubin-Asch on March 23. Before this appointment, Sizemore had reportedly been disrespectful towards PSU staff, engaged in sexually inappropriate behavior towards a psychiatric nurse practitioner, and ripped up testing materials.  Lemieux and Rubin-Asch explained to Sizemore that no referral to the WRC could be made because of this "recent behavior including attempts to solicit staff." (Dkt. #30-1 at 105.)  They then discussed other treatment methods with Sizemore, including prolonged exposure to help process his trauma, developing a routine, writing, and cognitive restructuring.  Sizemore denied any suicidal ideation, was given worksheets about challenging negative thinking and a workbook about PTSD.  Sizemore disputes that these treatment methods were adequate to meet his mental health needs, and further asserts that Rubin-Asch minimized his self-harming behaviors at the appointment by telling him to "grow up."  On March 25 Sizemore submitted another PSR, asking Lemieux to meet with him to develop a plan to address his PTSD, but she responded that this issue had just been addressed at their appointment on the 23rd, in which Supervisor Rubin-Asch also participated.

Sizemore met with Lemieux again on April 13, 2018.  Sizemore discussed the coping techniques he had been using, and Lemieux discussed cognitive behavioral therapy, which aims to foster coping skills, new thinking patterns, and future-focused thinking. Specifically, Lemieux introduced concepts of thought stopping and switching to Sizemore, explaining how these techniques could be useful to help him control his thought process. In response, Sizemore expressed continued interest in diagnostic testing, and confirmed that he had been reading the treatment materials Lemieux had given him.  He also denied

any thoughts of suicide or self-harm, but claims that when he showed Lemieux a recent scratch, she disregarded it.

At a follow-up appointment on April 24, however, Sizemore reported feeling "crazy" and "real down," as well as scratching himself after breaking up with his girlfriend.  Still, he denied thoughts of self-harm during the appointment and instead asked for a jigsaw puzzle.  (*Id.* at 100.)  Lemieux responded by sending Sizemore a book on dealing with the loss of relationships and advising that he would continue to be seen for scheduled appointments.

At his next scheduled appointment with Lemieux on May 21, 2018, Sizemore reported thoughts of self-harm, and scratching and banging his head against the wall, although Lemieux did not observe any evidence of recent head banging.  Sizemore also explained that he was trying the treatment methods Lemieux had discussed with him, but nothing was helping, and he was tired of not seeing results and felt that he was not being helped.  Sizemore further reported that he had stopped taking his medication because it made him feel angrier and more depressed.  However, he denied thoughts of self-harm that day.  Lemieux discussed the visualization as a coping skill, and noted that Sizemore's self-report was questionable as he contradicted himself several times, and continued to state that he was not being offered help while resisting certain forms of treatment offered.  (*Id.* at 98.)

Sizemore claims that he filed PSRs on May 3, May 13, May 21, and May 31 concerning his mental health needs, but the copies of these PSRs in the record are not stamped as received (*see* dkt. #42 at 36-39), and there is no other evidence that these PSRs were ever received in the PSU, much less reviewed by Rubin-Asch or Lemieux.  To the

contrary, in her May 31 response to Sizemore's May 28 information request, asking whether she had received any of "those PSU slips I wrote," Lemieux indicated that she had not found any. (Dkt. #55-1 at 2.)

### 4. Clinical Observations, PSRs and Mental Health Treatment later in 2018

On June 11, 2018, Lemieux evaluated Sizemore after he reported cutting himself and suicidal ideation. When Lemieux told him that she would place him on observation status, Sizemore became agitated. At a follow-up appointment with another clinician, Sizemore also admitted that he had not been taking his medication as prescribed.

Sizemore met with both Lemieux and Rubin-Asch again on June 29. Ignoring Lemieux, Sizemore asked for a new clinician. Lemieux and Rubin-Asch explained in response that "more psychological assessment could be done to help with further diagnostic clarification" and gave Sizemore rational emotional behavior therapy materials to help him challenge his unhelpful thoughts and avoid negative emotions and behaviors. Sizemore did not report any thoughts of self-harm.

Sizemore next claims he filed four PSRs in July 2018 concerning psychological testing and asking about a new clinician, but *none* of these PSRs are stamped as received or include a response. (*See* dkt. #42 at 45-48.) The three PSRs Sizemore submitted in August 2018 were received, and Supervisor Rubin-Asch responded to each.

On August 13, Sizemore asked "to be seen immediately," although Rubin-Asch asked him to first explain what he wanted to address. (*Id.* at 49.) Sizemore replied in an August 20 PSR asserting that Rubin-Asch should review his file because his concerns had already been provided *and* he was tired of being ignored. Then, on August 22, Sizemore

asked for a referral to WRC because he had "not been causing any problems for quite some time"; however, Rubin-Asch denied this request because "referrals are not made on the basis of keeping out of trouble." (*Id.* at 51.)

In total, Sizemore had 9 clinical observation placements with 10 distinct restraint placements for mental health concerns in 2018. Various PSU clinicians also saw Sizemore 11 times that year for appointments in addition to the clinical observation and restraint placement evaluations.

### 5. Mental Health Treatment in 2019 & 2020

Sizemore was assigned a new, nondefendant clinician in September 2018, who introduced the concept of dialectical behavior therapy and screened Sizemore for a related program at WSPF. After being selected to participate, Sizemore was seen weekly by PSU staff in group and individual therapy sessions from January until May 2019, when he was removed from the program after a decline in participation. At that time, Sizemore told his clinician that the program was not helping him address his issues, and he wanted to discuss his feelings with someone who would listen to him.

Sizemore was also placed on clinical observation in May 2019 -- the first time that year -- after making statements of self-harm. He was again placed on clinical observation in November 2019 for threats of self-harm. In December 2019, Sizemore became involved in the Restorative Justice class at WSPF, a voluntary group program that fosters empathy development, accountability for harms created, and the healing of victims, offenders, and communities. Sizemore also began meeting with an inmate mentor in 2019, and. Had

only two clinical observation placements with no restraint placements that year.  Finally, PSU clinicians saw him for 20 appointments in 2019.

In early 2020, Sizemore submitted a series of PSRs, renewing his interest in treatment at the WRC.  However, PSU staff informed him that he would need to complete his Restorative Justice class before a referral would be considered.  Sizemore saw Lemieux on April 1, to renew services with her, but reported no suicidal ideation.  That same day, Sizemore submitted a PSR to Lemieux asking for a referral to the WRC.  Even though he had completed the Restorative Justice class, Lemieux declined to support a referral at that time, apparently because she believed that the resources and staff at WSPF had proven adequate to address his mental health care needs.

On May 6, 2020, during a routine PSU round, Sizemore told Lemieux that he had not had any thoughts of actively trying to hurt himself since 2018, noting that his last two observation placements in 2019 were at his request.  He further reported enjoying art and his relationship with his girlfriend was going well, as was his working with the inmate mentor.  Lemieux explained that the WRC was not accepting many referrals at that time, because of the pandemic, and she could not support a referral yet, because she had just resumed working with Sizemore.  During another PSU round on June 5, Sizemore again denied any thoughts of self-harm and reported that he was doing well.

However, in July 2020, Sizemore overdosed on medication.  While in observation after his return from the hospital, he also broke a glass medication bottle and cut himself with it, after which he was placed in restraints and sent to the emergency room.  Lemieux followed up with Sizemore on July 14, 2020, stating that he did not know why he had engaged in self-harm, but thought it may have had to do with the COVID-19 pandemic.

Lemieux discussed reviewing dialectical behavior therapy skills, and Sizemore identified coping skills he had used regularly.  He also denied any suicidal ideation.  A few days later, on July 21, Lemieux sent Sizemore diary cards and a feelings chart, both of which had been discussed at their previous appointment.

Lemieux had scheduled appointments with Sizemore on September 17, November 19, and December 4, 2020.  During these sessions, Sizemore noted recent passive thoughts of self-harm, and said his suicidal thoughts were increasing, but Lemieux reviewed coping strategies, helped Sizemore problem solve how to manage his emotions after an incident with his psychiatrist, and sent him additional materials about coping skills.  She also discussed the possibility of a referral to the WRC by early next year if Sizemore continued to engage in therapy.  All told, Sizemore had one clinical observation placement in 2020, and was seen by PSU clinicians at 13 appointments.

Psychologist Supervisor Rubin-Asch opines that Sizemore never presented with psychosis or any other severe or persistent mental illness, but rather as an individual who had routine antisocial behaviors.  For Rubin-Asch, Sizemore's eventual compliance with therapy and the significant reduction in clinical observation and restraint placements show that his treatment at WSPF was effective for his behavioral health needs.  Moreover, Rubin-Asch asserts that the programming Sizemore was interested in at the WRC was available at WSPF as well.  Rubin-Asch further attests that Sizemore was not fully committed to his mental health treatment, and he rarely engaged in serious, self-injury behaviors despite his making frequent threats.

In contrast, Sizemore disputes these assertions, representing that he subsequently completed much programming at WRC unavailable at WSPF and that the quality of

WRC's programming was different.  Finally, he attests that he threatened or engaged in self-harm at least 54 times while at WSPF, although defendants were not aware of all those instances and regardless dispute that number, noting that Sizemore's medical records do not support it.

### D. Transfers to JCI and then WRC in 2021

Sizemore transferred to Jackson Correctional Institution in early January 2021, and was there for nine months, during which his new primary clinician:  conducted a mental health screening; noted his history of self-harm and suicidal ideation, mental health classification code of MH-1, and his diagnoses; and observed that he had been working with PSU staff at WSPF on decreasing negative thinking and improving his mood. Sizemore had nine clinical sessions with his new clinician between January and November 2021.

In February 2021, Sizemore again requested a referral to the WRC, but his new clinician noted, as had defendants, that he needed to continue to show treatment motivation and engagement.  His clinician gave him the same answer when he renewed his request in June, July, and August 2021.  In response, Sizemore continued to engage in therapy, including reviewing materials about different forms of psychotherapies, and he began expressing interest in understanding the cause of his behavior and developing coping skills.  Notably, Sizemore neither threatened self-harm nor engaged in any self-harming behaviors at JCI.  As a result, no clinical observation placements or restraint placement were necessary there.

19

On September 15, 2021, Sizemore's clinician submitted his referral to the WRC, which was accepted.  At WRC, staff provided clinical monitoring sessions and Sizemore also participated in peer mentor services, as well as several treatment programs, including Emotion Management Skills, Men's Recovery and Empowerment, Illness Management and Recovery, and dialectical behavior therapy.  WRC staff reported that Sizemore's mental health improved while at the facility.  In particular, staff noted a reduction in the number of conflicts he had with staff.  Sizemore completed treatment at the WRC in April 2022. He is currently on the transfer list to return to WRC to receive additional treatment.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

Defendants seek summary judgment on the merits of plaintiff's claim that they violated the Eighth Amendment's ban on cruel and unusual punishment by failing to provide him with adequate mental health care.  There is no dispute that plaintiff suffers from an objectively serious mental illness, including generalized anxiety disorder and antisocial personality disorder, with a history of regularly threatening and occasionally

20

engaging in self-harm. Thus, plaintiff meets the first element of an Eighth Amendment inadequate prison healthcare claim. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (no dispute that "mental illness" is a serious medical condition).

Accordingly, the parties' dispute centers on whether defendants were deliberately indifferent to plaintiff's mental health needs. "Deliberate indifference is a subjective mental state; the official must have actually known of and consciously disregarded a substantial risk of harm." *Rasho*, 22 F. 4th at 710. This demanding standard "requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quotation marks omitted). However, that an inmate receives some treatment does not foreclose his deliberate indifference claim if the treatment "was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

However, a plaintiff's "mere disagreement" with the course of his treatment, or even a disagreement among doctors exercising their independent medical judgment as to the appropriate course of treatment, is generally insufficient to establish an Eighth Amendment deliberate indifference claim. *Snipes*, 95 F.3d at 591; *see Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) (a prison doctor's rejection of another doctor's treatment recommendation for a medical reason is not deliberate indifference where both recommendations were made by qualified medical professionals). Indeed, "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho*, 22 F. 4th at 710; *see also Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("the mere failure of the

prison official to choose the best course of action does not amount to a constitutional violation."). That said, a single negligent act cannot support an inference of deliberate indifference, while persistence in a course of action known to be ineffective can. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016).

Here, to the extent the parties' dispute is over whether defendants Rubin-Asch and Lemieux chose "the best course of action," defendants are still entitled to summary judgment in their favor. *Peate*, 294 F.3d at 882. Although the court must view the facts in the light most favorable to plaintiff at summary judgment, the court must also consider "the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Petties*, 836 F.3d at 728. Since plaintiff acknowledges that he received treatment, his claim depends on proof defendants acted with deliberate indifference by minimizing his condition, ignoring evidence that he was self-harming, and rejecting his requests for diagnostic psychological testing and a referral to the WRC, even after he met their or other providers' requirements.

To begin, plaintiff faced a challenging environment at WSPF, but his narrow view of the record does not properly account for defendants' many attempts to address his mental health needs, both short *and* long term. Considering a totality of plaintiff's needs and care, a reasonable jury could not conclude on this record, and especially without guidance from any conflicting expert witness, that defendants failed to exercise medical judgment in treating plaintiff, much less consciously disregarded plaintiff's mental health needs.

As for plaintiff's specific claim that defendants disregarded certain evidence that he had self-harmed and minimized his condition, plaintiff points to his assertion that: (1)

Rubin-Asch told him to "grow up" when he showed this defendant cuts on his body and marks on his forehead at a March 23, 2018, appointment, with Lemieux present as well; (2) Lemieux ignored a "fresh scratch" at an appointment on April 13, 2018 (dkt. #56 at ¶ 69); and (3) defendants did not respond to his May 2018 PSRs reporting recent self-harm, suicidal thoughts, and the need for psychological intervention.  First, the record shows defendants were regularly apprised of plaintiff's experiencing suicidal thoughts and threats of self-harm, and regularly acted to address them in observation and, if necessary, restraints.  While plaintiff was at times dissatisfied with this treatment, he was also repeatedly advised that the "keys to his kingdom" were his own to the extent he engaged in coping and testing mechanisms still available at WSPF could result in improvement and an eventual transfer.  Third, as noted above, there is no evidence that *either* defendant ever received any of the PSRs plaintiff references, nor are they stamped as received.  Further, there is no indication of *any* review or response, and as Lemieux indicated in response to plaintiff's information request at the end of May, she had not found any "PSU slips" from him.  (Dkt. #55-1 at 2.)

Defendants also dispute plaintiff's contention that they ignored certain physical evidence of self-harm.  In particular, to the extent Rubin-Asch may have told plaintiff to "grow up" at the March 23, 2018, appointment, defendants assert that it was in response to plaintiff harassing staff members, which was the topic being discussed, not for his alleged self-harm.  For her part, Lemieux points out that her contemporaneous notes on April 13 do *not* indicate that plaintiff showed her a scratch or cut, *but* she does detail their discussion of techniques that are not self-injurious, such as taking ownership of problems, completing workbooks and packets, and his introduction to thought "stopping and switching"

techniques.  In other words, even if Lemieux did see a scratch, which plaintiff does not allege required any medical attention, she helped him in the form of discussing non-self-injurious coping techniques.  And against the weight of these few alleged incidents, the record shows that plaintiff regularly received nearly immediate attention from Lemieux and other clinicians under Rubin-Asch's supervision when he threatened or engaged in self-harm.

As already noted, to support an inference of deliberate indifference, the evidence must show "something approaching a total unconcern" for plaintiff's welfare -- neither negligence nor gross negligence will suffice.  *Rosario*, 670 F.3d at 821.  Because of defendants' undisputed, long and varied efforts to treat plaintiff detailed above, no reasonable jury could not find that defendants' conduct rose to the level of deliberate indifference.  Rather, based on the totality of his care by defendants from November 2016 to January 2021, even if not always optimal, a jury would be compelled to find that defendants acted promptly to reduce plaintiff's immediate risks of self-harm with medication restrictions, placement on observation status, and placement in restraints if he continued to self-harm.  Further, he was released only after a clinician was assured that he no longer presented as a risk to harm himself, and he had follow-up appointments after every observation placement, often with Lemieux, but also with other PSI clinicians and Supervisor Rubin-Asch.  Plaintiff was also seen by Lemieux and other PSU clinicians for appointments and cell front checks on a regular basis, and he was exposed to numerous kinds of coping techniques and therapeutic interventions, including workbooks, other written materials and group therapy.  Moreover, when plaintiff requested a new clinician, defendants granted the request.  Finally, tellingly, plaintiff's condition improved with time

24

in that plaintiff showed marked improvement in his final two years at WSPF in terms of engagement in therapies, including group therapy, working with a mentor, and less frequent placement on a protective status.  Indeed, although plaintiff began working with a new clinician in September 2018, his protective placements started to decrease while he was still working with Lemieux in mid-2018.

Nonetheless, plaintiff contends that defendants' efforts fell short as evidenced by the number of times he allegedly threatened or engaged in self-harm and by their refusal to refer him to the WRC or conduct psychological testing when he requested it despite their awareness of his history of mental illness and his dissatisfaction with their treatment. Again, however, plaintiff cannot "demand specific care" or "the best care possible;" instead, the Eighth Amendment requires "reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).  In the end, plaintiff's claim is for negligence in care, not even gross negligence, but *no* reasonable jury could find deliberate indifference on this record.

In addition to the measures noted above that defendants *did* take to address his risks of self-harm *and* his underlying mental illness, defendants credibly explain *why*, based on their medical judgment, they did not take the measures plaintiff wanted.  To start, plaintiff was classified as an inmate without serious mental health needs, a classification that did not change even after he transferred institutions, and Rubin-Asch opines that plaintiff presented with routine antisocial behaviors, rather than severe or persistent mental illness, including ongoing medical assessments in the face of plaintiff's repeated threats of self-harm and self-harming, and his self-reported, periodic suicidal thoughts.  Defendants also had to balance plaintiff's regular retraction of suicidal ideations once on protective

status, his typically superficial injuries or lack of any injuries, and his statements suggesting that his behaviors were an attempt to obtain "secondary gain" or manipulate staff.  (Dkt. #32 at ¶ 93.)  As this and other courts have noted, the "obligation to protect inmates like [plaintiff] who frequently proclaim their intent to harm themselves places a heavy burden on prisons and their staff, who then must take action in order to avoid a claim that they were deliberately indifferent to an inmate's welfare," presents the difficult situation where "the same person is both the hostage and the hostage taker." *Goodvine v. VandeWalle*, Case No. 16-C-890, 2018 WL 460121, at *8-9 (E.D. Wis. Jan. 17, 2018); *see also Goodvine v. Ankarlo*, Case No. 12-cv-134-wmc, at *1 (W.D. Wis. Jan. 29, 2015) (plaintiff's serious self-harm "posed a considerable challenge to" prison staff and treatment providers, in part because it was unclear whether plaintiff's conduct was compelled by mental illness or the result of maladaptive reasoning, or both).

In fact, plaintiff's most credible complaint may be that defendants should have altered approaches sooner in responding to his mental health needs.  However, while plaintiff disputes the appropriateness of defendants' assessment of his behaviors and his classification, he provides no contradictory expert opinion or similar evidence.  Instead, plaintiff relies on *Estate of Gomes v. County of Lake*, 178 F. Supp. 3d 687 (N.D. Ill. April 4, 2016), to support his contention that defendants should have intervened more robustly and sooner, even if he did not always comply with their treatment plan.  In that case, a pretrial detainee died after suffering severe dehydration at a county jail and her estate sued the county and individual defendants, alleging deliberate indifference to her serious medical needs.  Plaintiff emphasizes that even though the medical defendants in *Gomes* had repeatedly examined and assessed the rapidly declining detainee over 15 days, the district

court denied summary judgment.   Unlike here, however, the district court explained, "factual questions abound where the medical staff attended to Gomes on 57 occasions in fifteen days, but Gomes died anyway."  *Id.* at 701.  In contrast, plaintiff here was treated at WSPF over a period of about four years, and had begun a marked improvement by his second year without ever escalating the seriousness of his acts of self-harm or deteriorating markedly as to his mental health assessment.  Moreover, the district court in *Gomes* relied heavily on plaintiff's experts in finding "sufficient questions of fact relating to the medical defendants' care and treatment to put the question of deliberate indifference to a jury." *Id.* at 702.  As noted, plaintiff presents no such evidence here.

Plaintiff further argues that defendants were inconsistent in what they required of him to receive a psychological evaluation and to be referred to the WRC, noting that he was referred to the WRC relatively shortly after arriving at JCI from WSPF.   Again, however, his contention that defendants should have taken more steps to diagnose his mental health conditions properly sounds in "negligence or malpractice rather than deliberate indifference."  *Lewis v. Kumar*, 146 F. App'x 55, 57 (7th Cir. 2005.)  For one, plaintiff does not establish that other testing was necessary, or that he had been misdiagnosed, and he "is not competent to diagnose himself."  *Lloyd v. Moats*, 721 F. App'x 490, 494-95 (7th Cir. 2017) (citing *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).  Similarly, while plaintiff points to the fact that his clinician at Jackson in 2021 opined that he displayed symptoms associated with PTSD and bipolar disorder, even though he did not appear to meet clinical criteria for those conditions (dkt. #30-1 at 250), that does not give rise to a reasonable inference that this clinician disagreed with defendants' earlier assessment of plaintiff or misdiagnosed him, much less provided

constitutionally inadequate treatment.  *See Lloyd*, 721 F. App'x at 495 ("As long as Dr. Moats used medical judgment—and there is no evidence he did not—he was free to devise his own treatment plan.").

As defendant Rubin-Asch attests without dispute, it is difficult to effectuate an inmate's mental health treatment when he is frequently on protected status.  Plaintiff himself acknowledges that defendants told him that he needed to show behavioral and emotional stability before he could receive psychological testing and treatment at WRC, but claims he was refused testing even after his behavior improved and discussed testing with him in June 2018 even though he had recently engaged in self-harm.  Yet by that point, plaintiff had not been placed on observation for almost three months (his most recent observation placement aside), and he had shown some improvement not inconsistent with defendants' request for a period of stability.  Regardless, on this evidence, a reasonable jury could *not* conclude that defendants' decision to defer psychological testing, or to make it contingent on plaintiff's stability, was motivated by anything other than medical judgment that this approach would avoid reinforcing plaintiff's deliberate or unconscious manipulation, nor that defendants' approach was a substantial departure from accepted professional standards.  Moreover, contrary to plaintiff's assertion, he *did* receive various cognitive treatment and at least some psychological testing during his incarceration at WSPF.  For example, in his own declaration, plaintiff references taking a PTSD assessment at some unspecified point before May 31, 2018.  (Dkt. #39 at ¶ 62.)  While he also refers to requesting additional testing, he does not specify for what or why, beyond attesting that PSU needed to "properly diagnose me and focus on those specific issues." (*Id*.)  In other words, plaintiff's claim is only based on his own lay assessment of the care

he received, which is insufficient to survive summary judgment here.  *See Moats*, 721 F. App'x 494-95 (plaintiff is not competent to diagnose himself).

As for plaintiff's delayed referral to the WRC, he falls short of establishing a triable claim as well.  Plaintiff notes that a nondefendant clinician promised him a referral if he completed a certain program, but he cannot hold defendant Lemieux to account for not honoring a promise she did not make, especially given the fact that Lemieux had only recently renewed her work with plaintiff at that point.  Plaintiff also argues that Rubin-Asch contradictorily made a referral contingent on his behavior, only to tell him in June 2018 that referrals were not made "on the basis of keeping out of trouble" in response to plaintiff's statement that he had "not been causing any problems for quite some time now." (Dkt. #42 at 51.)  While plaintiff claims this somehow constituted inadequate treatment, Rubin-Asch's response to plaintiff's vague statement was not inconsistent with the WRC's acceptance criteria or his position that referrals required a significant reason *and* a willingness and capacity to engage in treatment, which plaintiff's documented past harassment of staff did not support in any event, despite recent good behavior.

Finally, plaintiff contends that defendants should have recognized the need for intensive treatment (as his clinician at JCI apparently did) and referred him to the WRC sooner.  However, this ignores that plaintiff had improved in his final two years at WSPF, and was participating in therapeutic programming at JCI, supporting defendants' position that his ongoing improvement was the result of his being adequately treated at WSPF, rather than proof of the opposite.  While plaintiff asserts that the WRC had some different programming, and offered more treatment opportunities, neither assertion establishes that the programming at WSPF was *inadequate* for plaintiff's needs.  Moreover, plaintiff has not

shown that his clinicians actually differed in approach:  he had already shown behavioral improvement at WSPF, had been told by his JCI clinician -- just as he was by defendants -- that he would need to show several months of "treatment motivation and engagement before a WRC referral would be considered," and remained at Jackson for about 8 months before being referred at WRC.  (Dkt. #30-1 at 250.)  That a nondefendant clinician at another institution eventually referred plaintiff to the WRC against this backdrop does not raise a genuine dispute of material fact as to the appropriateness of defendants' medical judgment not to refer him sooner.  *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (a disagreement between doctors, without more, is not enough to establish an Eighth Amendment violation).

In sum, a jury could reasonably conclude that the course of plaintiff's treatment at WSPF may not have always been optimal given the frequency of his placement on protective status during his first two years there, and he disputes the effectiveness of defendants' methods.  However, a finding of deliberate indifference is another matter entirely.  While plaintiff may not have agreed, the record overwhelmingly reflects that defendants took consistent measures to respond to plaintiff's needs, reduce his risks of self-harm, and provide various resources and coping techniques to reduce suicidal or self-harming thoughts, as well as address his mental illness, the record also shows that plaintiff ultimately engaged in treatment and improved.  Plaintiff has provided no conflicting guidance from a medical expert or other evidence allowing a reasonable jury to find that defendants' response was "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded

30

under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

Accordingly, defendants are entitled to summary judgment in their favor.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #27) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and to close this case.

Entered this 19th day of March, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge